1                     UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO

2                          EASTERN DIVISION

3   UNITED STATES OF AMERICA,

4           Plaintiff,           Case No. 5:05CR395
                             Akron, Ohio

5        vs.                 Thursday, July 16, 2009
                             11:00 a.m.

6   MICHAEL V. CHIOLO,

7           Defendant.

8

       TRANSCRIPT OF SUPERVISED RELEASE VIOLATION HEARING
9         BEFORE THE HONORABLE JOHN R. ADAMS
            UNITED STATES DISTRICT JUDGE

10
   APPEARANCES:

11  For the Government:  Robert E. Bulford
                      Assistant United States Attorney

12                 2 South Main Street, Room 208
                      Akron, Ohio 44308

13                 (330) 375-5716

14  For the Defendant:   Paul F. Adamson
                      Burdon & Merliti

15                 137 South Main Street, Suite 201
                      Akron, Ohio 44308

16                 (330) 253-7171

17                 Bradley R. Iams
                 Attorney at Law

18                 400 Huntington Bank Plaza
                 220 Market Avenue, S

19                 Canton, Ohio 44702
                 (330) 452-6400

20
   Court Reporter:      Caroline Mahnke, RMR, CRR

21                 Federal Building & U.S. Courthouse
                 2 South Main Street, Suite 568

22                 Akron, Ohio 44308
                 (330) 252-6021

23

24  Proceedings recorded by mechanical stenography; transcript
   produced by computer-aided transcription.

25

1          THE COURT:  For purposes of the record the Court

2   has before it today Case Number 5:05CR395.  The case is

3   United States of America versus Michael Chiolo.

4          We are here today for purposes of a supervised release

5   violation hearing.  The defendant previously appeared before

6   the Court on July 7, 2009 for an initial appearance.

7          On behalf of the government, are you ready to proceed,

8   please?

9          MR. BULFORD:  Yes, Your Honor, we are.

10          THE COURT:  On behalf of the defendant, are you

11   ready to proceed?

12          MR. ADAMSON:  Yes, Your Honor, we are ready to

13   proceed, and we would advise the Court at this time that Mr.

14   Chiolo is prepared to enter an admission to the violation by

15   virtue of having committed a -- having pled guilty and then

16   convicted of domestic violence, misdemeanor of the first

17   degree, which I think the Court indicated last time we were

18   together would consider as a grade C violation.

19          He does admit to that violation, and we would just ask

20   to be heard prior to disposition by the Court.

21          THE COURT:  All right.  Thank you, counsel.

22          Just one moment.  There is some documents I would like

23   to bring out here that have some bearing on the matter.

24   Just one moment, please.

25          (Brief recess.)

1        THE COURT:  Thank you.

2        Mr. Chiolo, you've heard your attorney indicate at

3    this time you wish to admit violating your supervised

4    release.  Is that what you would like to do today, sir?

5        THE DEFENDANT:  Yes, Your Honor, I would.

6        THE COURT:  Do you understand, sir, that by

7    entering this admission, you're giving up your right to a

8    hearing with regard to these allegations?

9        THE DEFENDANT:  Yes, I am, Your Honor.

10       THE COURT:  At that hearing you would have a

11   right, obviously, to cross-examine any witnesses that were

12   presented here; you would have a right to have the

13   allegations proven or established; and also, you would have

14   other rights with regard to these matters and these

15   proceedings.

16       However, it's my understanding that you wish to admit

17   to violating your supervised release by virtue of a

18   conviction for domestic violence, a misdemeanor of the first

19   degree.

20       THE DEFENDANT:  Yes, Your Honor.

21       THE COURT:  Do you have any questions about your

22   admission or any questions about your waiver of your rights

23   with regard to a hearing?

24       THE DEFENDANT:  No, there isn't any questions,

25   Your Honor.

1           THE COURT:  All right.  Thank you.

2           The Court would note this is a grade C violation.  The

3     policy statements only indicate that, again, the Court may

4     consider a five to eleven month sanction.

5           All right, sir.  You may be seated.

6           With regard to the violation, what's the government's

7     position with regard to a sanction with regard to the

8     matter?

9           Before we do that, let me just note for the record the

10    Court has received a substantial number of documents.  I

11    want to be certain the parties have received them as well

12    because they are going to be important and relevant for the

13    Court in its determination of an appropriate sanction in the

14    matter.

15          I have a docket, criminal docket from the Canton

16    Municipal Court.  I have an incident report from the Canton

17    Police Department.  I have voluntary witness statements as

18    well as incident reports, supplemental reports, from Melissa

19    Gregory, from others, I believe her mother, and officers.  I

20    have photographs of the victim in that particular case, and

21    I also have approximately an hour and 15 minute audiotape of

22    the interview of the victim which I have listened to in

23    part, but not in total, given the press of business here

24    this morning.

25          All of those things will be relevant to the Court's

1    sentence in the matter as well as, of course, I have the

2    original presentence report in this matter and the motion

3    for -- the Rule 35 motion that was made which resulted in a

4    modification of the defendant's sentence.

5        Counsel for the government, have you received all of

6    those documents, and do you have them?

7        MR. BULFORD:  Your Honor, I do have copies of all

8    of those documents, and I have a brief transcript of part of

9    that recording which was in the police report.

10       I also, because the Court said last week that you

11    wanted to hear about the incident itself and the injuries, I

12    also have here today Agent Jarrod Blanc and Don Miller who

13    interviewed the victim shortly after the incident, mainly

14    for drug intelligence, but they are here if the Court would

15    like to hear from them.

16       THE COURT:  I would, sir.

17       I believe it's appropriate for me to have all the

18    information I need in light of the circumstances giving rise

19    to this violation as well as other circumstances that would

20    have great bearing on the Court's sentence, such as, as I've

21    already touched on, the defendant's attempt to defeat drug

22    screens, as well as information that's been shared with the

23    Court in the report of violation which would -- or at least

24    may indicate that the defendant has returned to the

25    lifestyle which led him to this Court.

1      So any information you have, it's important.  Bring

2    the witnesses forward, and I'll hear from them and allow

3    those witnesses to be cross-examined.

4      Sir, if you want to step forward here to the witness

5    stand to my right.

6      Sir, please raise your right hand.

7                       JARROD BLANC,

8        of lawful age, a witness called by the Government,

9          being first duly placed under oath, was examined

10                    and testified as follows:

11         THE COURT:  Be seated in the witness stand, if

12    you would.  Adjust the microphone so that your testimony can

13    be heard by all the participants, please.

14            DIRECT EXAMINATION OF JARROD BLANC

15    BY MR. BULFORD:

16    Q.    Can you tell us your name, please, and spell your last

17    name.

18    A.    Jarrod Blanc, B-L-A-N-C.

19    Q.    And where are you employed, sir?

20    A.    I'm employed by the Stark County Sheriff's Office,

21    assigned to the Stark Metropolitan Narcotics Unit.

22    Q.    And in the course of your duties there, were you, on

23    June 11, 2009, was it called to your attention that there

24    was an incident involving Mr. Chiolo and his girlfriend?

25    A.    Yes, sir.

1   Q.    And how did you come to learn about that?

2   A.    Another agent from the Stark Metropolitan Narcotics

3   Unit, James Nixon, contacted me.  Also a Canton patrolman

4   advised me that -- Canton patrolman contacted him and

5   advised him of the domestic situation.

6   Q.    All right.  And you were interested in Mr. Chiolo why?

7   Why was that?

8   A.    Part of an ongoing drug investigation.

9   Q.    Now, what did you do when you learned about that?

10   A.    I contacted my supervisor and advised him, and it was

11   decided that we should probably respond to the Stark County

12   jail where Melissa Gregory was also booked in on an

13   unrelated case and try to obtain intelligence from her in

14   regards to drug intel.

15   Q.    And did you interview her?

16   A.    Yes, sir.

17   Q.    There at the jail?

18   A.    Yes, sir.

19   Q.    And who was with you when you interviewed her?

20   A.    Agent James Nixon.

21   Q.    Okay.  And what did you talk to her about?  Just

22   summarize for the Judge what you talked to her about and

23   what --

24   A.    Well, we briefly spoke about the domestic situation.

25   Basically she said that they had left -- she had left the

Blanc - Direct/Bufford

8

1    house at 2507 Anderson Place, Southwest, and came back, I

2    believe it was on two occasions, at which time she -- on one

3    of the occasions she discovered a female neighbor she

4    believed was performing oral sex on Chiolo in the garage

5    area, at which time her and the female got into an argument

6    which turned physical.

7        Chiolo restrained her -- Mr. Chiolo restrained her,

8    and then those two at that point got into a physical

9    altercation which led to her being taken to the hospital.

10   Q.    Okay.  And when you saw her, could you tell whether

11   she had been injured?

12   A.    She had bruises all over her face and arms.  I noticed

13   several what I would call defensive wounds which would be,

14   like, on the outside of the forearms, which would be

15   consistent with someone putting their hands up over their

16   face to try to block someone from hitting them.

17   Q.    Did you ask her if she was going to pursue -- or if

18   she wanted the authorities to pursue the assault charge, the

19   domestic violence charge against Mr. Chiolo?

20   A.    I did not.  I believe that was already went over by

21   Canton police, so --

22   Q.    Did you have any information about that at that time?

23   A.    Not at that time.  I discovered later that she

24   was -- she advised them that she did not wish to pursue

25   charges.

1   Q.    Okay.  How long did you talk to her?

2   A.    Probably around an hour and a half or so.

3   Q.    Did she give you information on other drug

4   intelligence?

5   A.    Not really, no.

6   Q.    Okay.

7            MR. BULFORD:  No further questions, Your Honor.

8            THE COURT:  All right.  Thank you.

9         On behalf of the defendant, you may cross-examine.

10           MR. ADAMSON:  Just briefly, Judge.

11              CROSS-EXAMINATION OF JARROD BLANC

12   BY MR. ADAMSON:

13   Q.    Officer, did the victim indicate that some of the

14   injuries that she suffered were suffered in the scuffle with

15   the other female?

16   A.    She didn't advise that.  It sounded to me like the

17   fight was pretty one-sided between the female and her.

18   Q.    Who got the best of it?

19   A.    I would say that Ms. Gregory got the better of

20   the -- Ms. Lindemood, I think was her name.

21   Q.    And did she indicate to you, Ms. Gregory indicate to

22   you whether she caused any injuries to Mr. Chiolo?

23   A.    She said he put her in a bear hug and she kind of

24   tried to get away from him.  Other than that, no.

25   Q.    Did she say anything about knocking any teeth out or

1    anything like that?

2    A.    No, sir.  No.

3    Q.    All right.

4              MR. ADAMSON:  Nothing further, Your Honor.  Thank

5    you.

6              THE COURT:  All right.  Thank you.

7         Anything further of this witness?

8              MR. BULFORD:  No, Your Honor.

9              THE COURT:  Sir, you may step down, please.

10        (Witness excused.)

11             THE COURT:  Sir, if would you approach the

12   witness stand and please remain standing while I administer

13   the oath.

14                   DONALD E. MILLER

15         of lawful age, a witness called by the Government,

16          being first duly placed under oath, was examined

17                and testified as follows:

18             THE COURT:  Be seated in the witness stand, sir.

19             DIRECT EXAMINATION OF DONALD E. MILLER

20   BY MR. BULFORD:

21   Q.    Sir, can you tell us your name, please, and spell your

22   last name.

23   A.    Agent Donald E. Miller, M-I-L-L-E-R.

24   Q.    And where do you work, sir?

25   A.    I'm employed with the Canton city police department

1    currently assigned to the Stark County Metropolitan

2    Narcotics Unit.

3    Q.    And were you so assigned on June 11, 2009?

4    A.    Yes.

5    Q.    Did you have occasion to respond to an incident at Mr.

6    Chiolo's house or in the neighborhood there?

7    A.    On the 11th, no, I was not -- I was contacted by Ms.

8    Gregory.  She had information she wanted to relay to us

9    about drug intelligence, things of that nature.

10   Q.    All right.  And when did you talk to her?

11   A.    I believe it was the 15th.

12   Q.    So it was about four days later?

13   A.    After the domestic incident, yes.

14   Q.    Did you see her in person?

15   A.    Yes.

16   Q.    And could you tell from seeing her, did she have any

17   after-affects of, like, a beating?

18   A.    Yes.  She had bruising all over her face and mouth,

19   all over the back of her arms and hands, and she even had

20   bruising on her legs.

21   Q.    Did she tell you anything about how that happened to

22   her?

23   A.    She had briefly described that she had been involved

24   in a domestic altercation with Mr. Chiolo after finding him

25   with another female, and that he had attacked her.  And then

1    she was later arrested for wrecking a car, and -- but we

2    didn't really get into all that.

3    Q.    Okay.

4    A.    She was providing drug intelligence.

5    Q.    She was providing drug intelligence about others?

6    A.    Yes.

7    Q.    Not Mr. Chiolo?

8    A.    She believed he was using heroin, and she had

9    information about the possible connection of where this

10    heroin was coming from.

11    Q.    She thought he was a user?

12    A.    Yes.

13    Q.    And that was the extent of that?

14    A.    Yes.

15    Q.    And she was telling you where she thought he was

16    getting the heroin from?

17    A.    Yes, sir.

18    Q.    Okay.  Have you followed up on that?

19    A.    We are working on it currently, yes.

20    Q.    All right.  Okay.

21          MR. BULFORD:  Nothing further, Your Honor.

22          THE COURT:  All right.  Thank you.

23    Counsel, you may cross-examine.

24          CROSS-EXAMINATION OF DONALD E. MILLER

25    BY MR. IAMS:

1    Q.    Agent Miller, with regard to the statements that

2    Melissa Gregory made to you, did she indicate to you that

3    she saw Michael using heroin or she suspected he was using

4    heroin?

5    A.    Through his actions and through recent contacts she

6    believed he was having with known heroin dealers, that's why

7    she believes he was using heroin.

8    Q.    But to clarify, she never said to you:  I saw him

9    using it?

10   A.    No.

11   Q.    Or:  I saw heroin in the house?  Or anything like

12   that?

13   A.    No.

14   Q.    She did indicate to you that she and he had

15   cohabitated in the house on Anderson, so she was living

16   there at that time, correct?

17   A.    Yes.

18   Q.    And there was a raid or a search warrant executed a

19   couple weeks prior to that, correct?

20   A.    Yes.

21   Q.    Was any heroin or heroin paraphernalia located in

22   connection with that raid?

23   A.    No.

24   Q.    Thank you.

25                    THE COURT:  I have a question, sir.  With regard

1    to the raid in question that you've referenced here, what

2    was recovered during the course of that raid, if you're able

3    to tell the Court.

4           THE WITNESS:  From Mr. Chiolo's house, we

5    recovered marijuana paraphernalia and large sums of U.S.

6    currency.  And I think that's about it.  I don't remember

7    all the inventory.

8           THE COURT:  I have a report that indicates there

9    was $83,053.50 recovered.

10          THE WITNESS:  Yes.

11          THE COURT:  Is that accurate?

12          THE WITNESS:  Yes.

13          THE COURT:  All right.  Thank you.

14      Do my questions give rise to any further questions by

15   counsel for the government?

16          REDIRECT EXAMINATION OF DONALD E. MILLER

17   BY MR. BULFORD:

18   Q.    Just, Your Honor, when they found that large amount of

19   cash, was there an inquiry into where that came from?

20   A.    I didn't particularly interview Mr. Chiolo, but it was

21   believed that it was from prior drug proceeds which has

22   brought him to this Court in the first place.

23   Q.    You mean before -- from the previous -- from the

24   conviction that he is on supervised release for?

25   A.    Yes.

1   Q.    That was not discovered when they did the search

2   warrants back then?

3   A.    I'm not particularly certain of all that.

4   Q.    Okay.

5         THE COURT:  Any questions on behalf of the

6   defendant in response to this Court's questions?

7         MR. IAMS:  Yes, sir.

8         CROSS-EXAMINATION OF DONALD E. MILLER

9   BY MR. IAMS:

10  Q.    Are you aware that Michael advised the agents that

11  that money had to have been his father's money?  Were you

12  aware of that interview, even though you may not have

13  conducted it?

14  A.    I did not conduct it, but I do remember them talking

15  about it.

16  Q.    And do you recall them looking at the dates on those

17  bills to determine were any of them, for example, newer than

18  2005?

19  A.    I don't recall that.

20  Q.    So you don't know whether those bills had been

21  examined?

22  A.    I haven't examined them.

23        MR. BULFORD:  Your Honor, I can state that I was

24  told by Special Agent Tideswell that there were no dates on

25  the bills after 2005.

```
 1              THE COURT:  None after 2005?

 2              MR. BULFORD:  So the dates on the bills were

 3   before his other arrest?

 4              THE COURT:  Thank you.

 5   BY MR. IAMS:

 6   Q.    Were you aware of the fact that the residence in

 7   question previously had been Mr. Chiolo's father's and

 8   mother's residence?  In fact, his mother still resides

 9   there.  Were you aware of that?

10   A.    Yes.

11   Q.    That you.

12              THE COURT:  All right.  Thank you.  Any other

13   questions, please, of this witness?

14              MR. BULFORD:  No, Your Honor.

15              THE COURT:  All right, sir.  You may step down.

16        (Witness excused.)

17              THE COURT:  Anything else on behalf of the

18   government, please?

19              MR. BULFORD:  No, Your Honor.

20              THE COURT:  At this time what does the defendant

21   wish to present either by way of evidence or etcetera?  Let

22   me -- before I do that, let's just confirm for the record

23   that you received copies of the various incident reports,

24   the photographs of the victim, as well as the audio

25   recording.  Have you received those?
```

1        And I want to just make clear I'm going to consider

2    those as part of the Court's overall consideration of the

3    matter under 18:3553(a).

4             MR. IAMS:  No, we have not received all of those.

5        We saw the photographs at the last hearing, but as far

6    as the incident report and the transcript and the tape, I've

7    not seen or heard any of those.

8             THE COURT:  We will provide you a copy here in a

9    moment.  We will adjourn and let you look at them because --

10   Mr. Bulford, I know you have an obligation in Cleveland.  We

11   will notify Judge Gwin's chambers that you have been delayed

12   here because of my schedule, but we will provide counsel

13   with a copy because it may have a direct bearing on -- at

14   least very important to my consideration.

15       We will get a copy made for you here in a moment.  Do

16   you have copies, Mr. Bulford?

17            MR. BULFORD:  I have copies.

18            THE COURT:  All right.

19            MR. IAMS:  We do intend, just for the Court's

20   information, we have one witness to present.

21            THE COURT:  That's fine.  We will do that.

22       We will stand adjourned for about 15, 20 minutes here

23   until such time as counsel has had an opportunity to review

24   the reports.

25            (Recess taken, 11:15 a.m. until 11:40 a.m.)

1          THE COURT:  Counsel, have you had an opportunity

2     to review the various documents I've referenced earlier?

3          MR. IAMS:  Yes, we have.

4          THE COURT:  Are you ready to proceed at this

5     time?

6          MR. IAMS:  Your Honor, Melissa Gregory is here

7     today.  She would like to make a statement to the Court.

8     Would you rather have her approach the podium and speak

9     directly to you, or I can put her on the witness stand.

10          THE COURT:  Whatever you would like, sir.  Either

11     one is agreeable.  However, I would expect that perhaps she

12     better be placed under oath and questioned in that fashion

13     so that she understands the implications of testifying here

14     and counsel for the government can then cross-examine her if

15     they wish.

16          MR. IAMS:  Melissa, I'll call you to the stand.

17                    MELISSA GREGORY,

18          of lawful age, a witness called by the Defendant,

19            being first duly placed under oath, was examined

20                  and testified as follows:

21          THE COURT:  Please be seated in the witness

22     stand.

23        Counsel, you may inquire.

24          MR. IAMS:  Thank you, Judge.

25          DIRECT EXAMINATION OF MELISSA GREGORY

1   BY MR. IAMS:

2   Q.    Melissa, will you please give your full name.  Speak

3   up for the court reporter.

4   A.    Melissa Florence Gregory.

5   Q.    Melissa, what is your relationship to Michael Chiolo?

6   How do you know him?

7   A.    He is my boyfriend.

8   Q.    And how long have you known Michael?

9   A.    We have been dating for about five years.

10  Q.    Directing your attention back to the first week in

11  June or thereabouts, June 11, where were you residing at

12  that time?

13  A.    At his home.

14  Q.    Where is that located?

15  A.    2507 Anderson Place.

16  Q.    Besides you and Michael, was anyone else residing in

17  the home?

18  A.    Yes, his mother.

19  Q.    Michael's mother?

20  A.    Yes.

21  Q.    Do you know her name?

22  A.    Carol Chiolo.

23  Q.    Can you give the Judge a brief description of Carol's

24  condition?

25  A.    Carol, right now, is unresponsive to anybody other

1   than Michael.  She doesn't talk to me.  She won't take

2   showers.  She won't take care of herself.

3        I've had to call, you know, nurses aids, you know, to

4   ask them what I should do.  And they say that, you know, as

5   long as she is eating and breathing, she is okay, and that

6   we can't force her to do anything.  But she is unresponsive

7   to anybody, you know, me, the neighbors, people that she

8   stays with.

9   Q.   I understand you are not a medical professional, but

10  do you know what her condition is?

11  A.   She has onset of dementia, and that comes from her

12  doctor.

13  Q.   How long has that been going on to your knowledge?

14  A.   I would say about two years.

15  Q.   How has that, to your knowledge, affected the

16  situation at home with Michael and you?

17  A.   It puts everybody under tremendous stress.  I've had

18  to carry the weight this past couple of weeks, and I

19  understand the kind of stress because I have to deal with

20  it.  You know, there is times that I have to watch my temper

21  and like that because it just gets so frustrating not

22  knowing what to do, not knowing how to handle a situation.

23  It gets frustrating.

24  Q.   I want to direct your attention specifically to June

25  11, the day that this ruckus took place.  Can you explain to

Gregory - Direct/Iams

1    Judge Adams your recollection of what happened that day?

2    A.    Yes.  I woke up and I went out to the garage and seen

3    our neighbor, Jen, with her head in Michael's lap.  And at

4    that point, I snapped.  I grabbed Jen and threw her on the

5    ground.  And Michael tried to stop me from hurting Jen.  And

6    at that time I punched Michael in his mouth and broke his

7    two front teeth out.

8    Q.    Did you sustain an injury on your hand from that

9    punch?

10   A.    Yes, sir.

11   Q.    Do you know which hand it was?

12   A.    Yes.  My right hand.

13   Q.    What teeth did you break?

14   A.    One was a false tooth, and the other one was his front

15   tooth.

16   Q.    What happened after you and Michael engaged in this

17   altercation?

18   A.    Everything's very blurry.  We had altercations

19   throughout the day.  I was told that I had came back to the

20   house.  I did have a concussion, and I wasn't sure of

21   everything that was going on.  But I know we did get into an

22   altercation, though.

23   Q.    So numerous altercations?

24   A.    Yes.

25   Q.    Did he strike you?

Gregory - Direct/Iams

22

1   A.   Yes.

2   Q.   Did you yourself at some point get arrested that day?

3   A.   Yes.

4   Q.   Could you tell the Judge the circumstances surrounding

5   that?

6   A.   I got arrested for driving my car and wrecking my car

7   into a fence across the street from 2507.  I got arrested

8   for driving that car.

9   Q.   Did you at some point get medical attention?

10  A.   Yes.

11  Q.   Where did you receive that medical attention?

12  A.   At Aultman.

13  Q.   Can you tell the Judge the nature of the medical

14  treatment you received?

15  A.   I went in and they put me on an I.V.  I don't really

16  remember it too much at the hospital.  I remember the

17  officers being there, but I can't remember, you know, what

18  was said.  I remember telling them if I had to get medical

19  treatment, that I didn't want to be here, you know, in the

20  hospital, getting treatment.

21       I don't know what they did for me as far as, you know,

22  helping me, but I know that they wanted to just check and

23  make sure that my head was okay.

24  Q.   And how long were you at the hospital?

25  A.   I couldn't tell you that.

1    Q.    From the hospital, did you go home or did you go to

2    jail?

3    A.    I believe I went home and then went to jail.  It's

4    very -- my mom's the one that told me that.

5    Q.    Have you had any follow-up medical treatment with

6    regard to the injuries that you received?

7    A.    No.

8    Q.    Can you describe for the Judge what those

9    injuries -- he does have photographs, but in your mind what

10   were the injuries that you received?

11   A.    Other than my head, I really didn't -- I didn't see

12   myself or anything like that.  I'm not -- I don't have any

13   injuries now.  I'm not broken or anything.

14   Q.    Do you have any scars or anything?

15   A.    No.  No scars.  Nothing life-lasting.

16   Q.    Did you cooperate with the prosecutors in regard to

17   Michael's case?

18   A.    Yes.

19   Q.    Did you meet with them?

20   A.    Yes.

21   Q.    And explain your version of what happened, what you

22   wanted to see happen?

23   A.    Yes.

24   Q.    What are your feelings now about Michael?

25   A.    I'm not mad at him.  I don't hate him.  I don't

1    condone anything that he has done.  I just wish that we

2    could figure out what's going on as far as, you know, is it

3    a stress issue that this is why this happened.  I believe

4    it's just an accident, like, that went out of proportion.

5    And honestly, if I wouldn't have punched him in his mouth, I

6    don't believe that this would have happened.

7  Q.    Had anything like this ever happened before between

8    the two of you where he was violent with you in any way?

9  A.    No.

10         MR. IAMS:  Your Honor, I believe that's all the

11   questions I have.

12         THE COURT:  Thank you.

13      Any cross-examination, counsel?

14         MR. BULFORD:  No, Your Honor.

15         THE COURT:  I'm sorry?

16         MR. BULFORD:  No, Your Honor.

17         THE COURT:  All right.  Ma'am, you may step down.

18      (Witness excused.)

19         THE COURT:  Anything further on behalf of the

20   defendant?

21         MR. ADAMSON:  Your Honor, we don't have any

22   further witnesses.  I would ask the Court for leave to make

23   a brief statement on Mr. Chiolo's behalf, and then he would

24   like to address the Court.

25         THE COURT:  You may.

1          MR. ADAMSON:  Your Honor, first, relative to the

2     issue of the urine sample, we have no explanation for it.

3     We don't dispute the result.  We can only tell you Michael

4     has indicated that -- and I think that Ms. Worlds would

5     confirm -- that this sample as I understood was taken the

6     second day.  He had been in jail for a day, and this

7     was -- I think he got arrested on the 11th, and this was

8     June 12.  It was conducted at the jail.  I think Ms. World's

9     was in an outer room, and there was a deputy in the same

10    room with Mr. Chiolo who had, prior to that, like all

11    inmates, he indicated to me he had been searched, etcetera,

12    and checked and dropped his pants, etcetera.  And some

13    problem with the flushing the toilet too many times.  In any

14    event, he produced a sample and he has no explanation for

15    it.  We are not disputing it.  We have no basis to dispute

16    the suggestion that there was something wrong with it, but

17    he has no explanation and would suggest that he didn't do

18    anything to tamper with that.

19         I would note that it's my understanding that during

20    the nine months that he has been on supervision, there have

21    not been any dirty urines, and I guess that's what I would

22    like to sort of sum up with, Judge.

23         The history with Michael, he does not have a history

24    of violence towards people.  So in that sense, this was an

25    aberrational event.

1    He had made, I think, significant progress for

2  somebody who apparently was a man of the streets for a long

3  time before he went to prison, and was in prison for a

4  significant period of time.  And this was a new lifestyle

5  for him back in the house where he was raised, but not the

6  house where he was living at the time he was arrested.

7    I believe he was trying.  I believe that he was trying

8  to do too much himself, quite frankly, in my conversations

9  with him, that maybe -- he's got this persona like he's a

10  tough guy, and I think that's what was going on with him.

11    He went back into the house with his mother.  And I

12  think the Court might recall, I think she was here a couple

13  court appearances in the past, she is very infirm, very

14  frenetic.  She is a handful.  And she is in advanced

15  dementia.  And Michael tried to take all this on.

16    And this is the house where his father committed

17  suicide while he was incarcerated.  And I don't say that to

18  make light of it.  These are real factors, I think.  And I

19  think what happened -- he snapped that day, Judge.  And I

20  think that when he tries to recall some of these events he

21  will tell you himself that he doesn't have a good

22  recollection of it.

23    And if this was a guy who a had a history of beating

24  people up, I wouldn't necessarily think that he is being

25  honest with us, but I think that there is a basis for that.

1      He never had any psychological counseling, and I think

2   that's what happened that day.  And I would ask the Court to

3   take those things into consideration, not as an excuse but

4   maybe as an explanation for what happened that day, and

5   hopefully then to find that it was aberrational in that

6   sense.

7      I know that as a Class C violation that the Court can

8   certainly revoke his supervised release.  At the same time,

9   the Court could retain him on supervised release with more

10  stringent terms.

11     If the Court does revoke the supervised release and

12  imposes a sentence, we would certainly ask the Court to

13  consider a sentence in the range of five to eleven months.

14  And I believe if the Court imposed the five-month sentence,

15  the Court could order that served entirely by local

16  incarceration, electronically monitored house arrest, or

17  something along those lines.

18     And I would note that he has been locked up now for 40

19  days.  As part of -- as one of the conditions of disposition

20  in the state court, he was ordered to enter and complete a

21  26-week program at Summit Psychological that focuses on

22  anger management in addition to other issues.

23     And I think clearly he needs that.  He would welcome

24  it.  And I would ask the Court to consider that as an

25  option.

1      And Mr. Chiolo would like to address the Court as

2   well.

3            THE COURT:  Thank you.

4      Mr. Chiolo, what statement would you like to make on

5   your own behalf?

6            THE DEFENDANT:  Yes, Your Honor.

7      First I would like to say I remember I talked very

8   well as of August -- October 2 or 3, with taking part in

9   anything of the old lifestyle as far as drugs, selling or

10  anything goes.  I have not taken part in the use or the sale

11  of any drugs since that -- since before that time.  My last

12  time getting high on marijuana would have been July 19,

13  2005.  That was my last day to use.

14     I have, you know, in the past, few different cases,

15  I've done different things.  And I've listened to people

16  about what they do.

17     With the drug test, that's unexplainable to me.  Any

18  time I would have flushed that toilet, I clearly held the

19  cup out to my side so they could see it.  Of that, I do not

20  know what's wrong.

21     I have Special Agent Tideswell that drives by my house

22  three times a week.  He wishes for me to call him once a

23  week so he can ask me for information.  The stress of him

24  coming by and asking this, people that see this gentleman

25  slow down and stop, or even drive by and wave, it's

1    stressful not only, but also scary at times.

2           As far as drug use, I have not partaken.  I can't do

3    that.  That's completely off my path.

4           But as far as anything else with my actions, I cannot

5    explain them, but I'm very sorry for them.  I've taken care

6    of my mother, and I think Ms. Worlds will attest that from

7    the first day that she has come by for a home visit and saw

8    my mom in her condition, and she has made home visits, her

9    condition has improved, I would say, considerably from her

10   appearance, to her morale, to the cleanliness of the house.

11          They go back to where they say money was found.  That

12   was in my dad's room.  I still look at the wall to where

13   there is a hole in it from where the bullet exited his head

14   and out through the wall.  That's a hard room for me to be

15   in.  There was ashes from where he was cremated just

16   recently recovered one week prior to the incident.

17          Melissa, like she said, she is my fiance.  We've been

18   together five years.

19          THE COURT:  She is your fiance?

20          THE DEFENDANT:  Yes.

21          THE COURT:  I've listened to the tapes.  I've

22   listened -- I've read the reports.  This is first time I've

23   heard anyone reference the quote/unquote idea that Ms.

24   Gregory is your fiance.  Is this some recent engagement?

25          THE DEFENDANT:  No.  We have been engaged for

1   four years now.  Ms. Worlds, any time I would have spoke to

2   her --

3             THE COURT:  That's certainly not consistent with

4   the statement she's given on the audiotape which I listened

5   to and the statement I have in the police report.  That's

6   besides the point.  I'll address that in a moment.  Go

7   ahead.

8             THE DEFENDANT:  Yes, Your Honor.

9        We have been engaged since -- I can't tell you the

10  exact date, but it was June of 2005 in which we were engaged

11  to be married.

12            THE COURT:  All right, counsel.  Go ahead,

13  please -- Mr. Chiolo, go ahead.  You can finish.

14            THE DEFENDANT:  We were engaged since June of

15  2005.  I love her very much.  Through the almost four years

16  I was gone, I come home to a train wreck.

17       I don't think there is a woman I love more, and I

18  can't even explain what happened on the day of June 11.

19  When I come home October 8, she stated to me that she was

20  pregnant due to infidelity.  I didn't snap and lose my

21  control.  She was pregnant from another man.  I held her

22  hand through hospitals, miscarriages, to where I sped down

23  77 to go to YMCA to pick her off the floor when the

24  ambulance wasn't there to pick her up.  It is a

25  heart-breaking situation.

```
 1          Months later I was with her at the doctors when she

 2     contracted a disease from that former relationship, and I

 3     didn't snap and lose my temper then.

 4               THE COURT:  Sir, I'd appreciate it if you don't

 5     share with me private matters regarding the victim.  She is

 6     a victim.

 7               THE DEFENDANT:  I apologize.

 8               THE COURT:  That certainly will not help you in

 9     any way, shape, or form with this Court.

10               THE DEFENDANT:  I understand.

11               THE COURT:  It's not appropriate to outline any

12     kind of physical ailments or other matters regarding the

13     victim to try to mitigate your sentence in this matter.

14               THE DEFENDANT:  I'm not, sir, not whatsoever.

15               THE COURT:  Well, you are.

16               THE DEFENDANT:  I love her very much, and I am

17     with her in that aspect.  I love her very much, and I would

18     not -- I lost my temper then.  I partake in -- you know, I'm

19     going to carry her with the illness that she has now.  I

20     love her very much, sir.

21          And as far as this happening, did a kid come out, I

22     don't know.  What happened, whether I snapped, I -- I'd like

23     to say I take full responsibility of this.  I lost my

24     temper.  I blacked out.  I don't know what happened from

25     that point.  But as a man, as a man on probation, as a
```

1    God-fearing man who loves his family, these kind of acts are

2    out of my character.

3         I mean, I went through drug counseling over the years,

4    and I have not touched drugs.  I have yet to have any anger

5    management or any psychological help.  And for my family,

6    for my wife to be, my mother who needs me, and my kids, and

7    for society, I want to be the best person I can be.

8         You know, prison, it brought some things to light, but

9    a lot of heartache happened though those times in prison as

10   well.

11        I would really wish to seek some sort of help in this.

12   I wish to go under a psychological evaluation.  I think it

13   would be beneficial to me, as far as any marriage counseling

14   or anything that could help down the road.

15        I've been involved in Christian fellowship.  I've been

16   involved in Bible studies on Thursday with Jehovah's

17   Witnesses.  I've coached track with my fiance for St.

18   Michael's School.  I've been involved with kids and never

19   have any outburst like this.  And for me to lose control and

20   not knowing exactly what my emotions were, I need help with

21   this issue of anger, with this issue of hostility, or

22   whatever happened that day on June 11, because it was not

23   drug use.  It was not out of my mind being drugged.  That's

24   a lifestyle I left behind.

25        You clearly stated for me that the sentence would be

1    imposed if I was found doing any of that illegal activity,

2    among new charges that could be brought up.

3         Like I said, I see agents driving up and down the

4    street, that I'm accused or insinuated to do things.  I'm

5    not of that -- I'm not of that element anymore, Your Honor.

6              THE COURT:  All right, sir.  Anything else you

7    wish to tell me?

8              THE DEFENDANT:  Yes.  I come to you today to just

9    tell you my heart.  I mean, I need help and I wish to seek

10   help with this.  You know, I haven't used drugs.  Prison

11   will not help me.  I want to take care of my mother.  I want

12   to be there for my 14-year-old daughter who is becoming a

13   woman pretty fast, my six-year-old daughter who still needs

14   taught the necessities of life.  I want to ease the burden

15   for Melissa to where she isn't overwhelmed by this.  I want

16   to be there for my mom.

17        Stricter impositions.  If Ms. Worlds, or the probation

18   system, or psychological system, drug treatment system,

19   needs anything, I would be more than willing to do it.  I

20   underwent 11 weeks of drug counseling, random urinalysis

21   every Monday during which everything came back negative.  I

22   go to meetings every week along with another half hour

23   meeting once to twice a month.  And I've successfully

24   completed those, except for the last week in which this

25   melee happened.

1    And Your Honor, I'm being very truthful with you.  I'm

2    being very sincere with you.  I'm sorry if anything seemed

3    like I was trying to mislead you to put any burden on

4    someone else, but I take responsibility for those actions.

5    And I wish to get help for those.  This is out of my

6    character, and I do not wish to partake in anything like

7    that.  I want help.  I want to be a good person, and I've

8    been working very hard.  I don't know if stress happened due

9    to my mom, stress happened due to everyday occurrences.

10    Before I used to smoke marijuana to calm my nerves.

11    That is not part of my lifestyle anymore.

12    THE COURT:  All right, sir.  You need to finalize

13    your comments, please.

14    THE DEFENDANT:  Thank you, Your Honor, for your

15    time, and I do appreciate it.  God bless you.

16    THE COURT:  Thank you.

17    Counsel, please, for the record I want to make sure I

18    have the original photographs of the victim.  I believe they

19    may have been provided to one side or the other, and in

20    error the clerk provided you with the originals and not the

21    photographs.

22    MR. IAMS:  I think the ones we have are smaller

23    than the originals.  The originals I saw were larger.

24    THE COURT:  I want to determine -- make sure I

25    have them so they can be made part of the record in the

1   case.  They're far clearer than the photograph copies I

2   have.

3        I'm not certain if these are the originals either, but

4   we will obviously make certain that we have the originals.

5            THE DEPUTY CLERK:  I only made one copy, Judge.

6   It's either those or these.

7            THE COURT:  Thank you.  Anything further on

8   behalf of the government?

9            MR. BULFORD:  No, Your Honor.

10           THE COURT:  For purposes of the record, I want to

11  revisit, so it's clear, make certain that my memory and my

12  records are accurate with regard to the defendant's

13  sentence, prior sentences, because those, of course, are

14  relevant in some respect to the Court's determination of an

15  appropriate sanction in this particular matter.

16       At the time of the original sentencing, the defendant

17  faced a mandatory minimum of ten years to life.  The

18  guideline provisions were 120 to 125 months.

19       Based upon a written plea agreement and a downward

20  adjustment of two levels for substantial assistance, the

21  Court's guideline calculation then became an offense level

22  25 at a criminal history category III.

23       At that offense level the defendant's advisory

24  guideline calculation, I believe, was 70 to 87 months.  And

25  the Court was relieved of the obligation to impose the

1    mandatory minimum.

2          On behalf of the government, sir, am I accurate in my

3    belief as to the original guideline calculation and with

4    regard to sentencing?

5          MR. BULFORD:  I believe that's correct, Your

6    Honor.

7          THE COURT:  On behalf of the defendant?

8          MR. ADAMSON:  I believe that's accurate, Judge.

9          THE COURT:  Thereafter, the government sought and

10   I granted this defendant another downward adjustment

11   pursuant to Rule 35(b).  I modified his sentence to 41

12   months with credit for time served.  And that modification

13   took place on October 2, 2008.

14         Counsel for the government, am I accurate in my belief

15   as to that modification as well?

16         MR. BULFORD:  That's correct, Your Honor.

17         THE COURT:  On behalf of the defendant?

18         MR. ADAMSON:  Correct, Your Honor.

19         THE COURT:  Thank you.

20         The Court now has the task of determining an

21   appropriate sanction for the violation in this case.  The

22   violation is an M-1 domestic violence.  That is the

23   technical nature of the violation.

24         The Court also is cognizant, and I've made the parties

25   aware of the fact that I would consider in this case the

1    fact that the defendant in some fashion failed a drug screen

2    and that there was substantial evidence to support the fact

3    that another substance was substituted or there was some

4    attempt made generally to defeat the drug screen.

5         I find no credible evidence to support the fact that

6    anything other than that has occurred in this particular

7    case.

8         Likewise, just to comment briefly on the evidence I

9    have before the Court, I've listened carefully to Ms.

10   Gregory who has appeared here today, however, unfortunately,

11   I have also listened to portions of the statement she gave

12   to representatives of law enforcement by way of an audio

13   recording which I'll also make part of the record, and I've

14   also considered the statements that she gave to law

15   enforcement at or near the time of the events in question,

16   that is, the vicious beating that she suffered at the hands

17   of this defendant.

18        Unfortunately, I'm constrained to believe that the

19   statements she made here today are not credible as compared

20   and contrasted with the statements she made earlier.  And

21   more importantly, the Court is of the belief that the

22   statements and the report from the victim's mother -- and

23   that is how I characterize Ms. Gregory, she is a victim,

24   clearly a victim -- and the victim's mother gave a statement

25   which I believe is far more important and relevant in the

1    Court's consideration of the nature and extent of the

2    defendant's wrongful conduct, and also information that was

3    obtained generally from Aultman Hospital and/or statements

4    and information contained therein.

5         Make no mistake, this was a vicious beating.  It began

6    at the residence occupied by Ms. Gregory and Mr. Chiolo.  It

7    continued after Ms. Gregory attempted to retreat to her

8    mother's home.  And the defendant followed her to her

9    mother's home and continued to beat her despite the fact

10   that she had left the residence in an attempt to escape the

11   kind of beating that she suffered.  This was not an isolated

12   incident.

13        The defendant, likewise, in addition to beating Ms.

14   Gregory, he made threats to her mother, indicated he was

15   going to -- and I'll quote from her statement:  "Okay, so

16   then I took her out of -- she ran out of the house, jumped

17   in the car, and then he came after me, where he was

18   threatening me, he is going to hit me, he is to going kill

19   me, whatever.  I just told her to drive the car off so he

20   couldn't get ahold of her again.  When she came around the

21   block and picked me up, we went back to the Aultman ER."

22        This was not, as described, some generic domestic

23   violence.  This was a violent crime committed to beat this

24   poor woman and continue to beat her even when she tried to

25   seek refuge in another residence.  She suffered a

1    concussion.  She obviously admits she can't recall all that

2    happened during the course of this beating.

3         It's a violent crime, clearly a violent crime, broken

4    down to a misdemeanor, I'm sure, because the victim, as in

5    most all of these domestic violence kind of situations,

6    recants or is afraid to come forward and give truthful

7    testimony.  The pictures in this case are worth a thousand

8    words.  They tell you all about the nature of this assault.

9         The Court's required -- there is no guidelines for

10   supervised release by revocation of sentences.  We have been

11   directed that in imposing a term of imprisonment, if we

12   chose to do so, we should consider the policy statements

13   contained in Chapter 7 of the sentencing guidelines as well

14   as the relevant statutory factors in 18 United States Code

15   3553(a).

16        And I would cite for the record the authority I

17   reviewed and looked to in considering a sentence in this

18   matter, that being case law at U.S. versus Bolds, 511 F.3d,

19   568, and the authorities cited therein.

20        Given the nature and circumstances of this offense,

21   the nature and circumstances of the violent offense that

22   brings the defendant before me, I've already outlined how

23   severe and how serious I believe this assault to have been.

24   It is a crime of violence under 4B1.2 of the guidelines.  It

25   is a grade C violation technically.  It is far greater than

1    that, outside of the policy statements set forth under the

2    guidelines, which I'm not bound to follow.

3          The history and the characteristics of the defendant.

4    He has been given great consideration because of his

5    cooperation.  A mandatory minimum of 120 months went to a

6    78-month sentence, and from there a 41-month sentence.

7          He has been granted a dramatic reduction in a

8    sentence, in a sanction that he clearly, clearly deserved by

9    virtue of his extensive drug trafficking behavior.

10         He tells me today that this action against his

11   girlfriend and/or fiance is driven solely by anger and that

12   he is not using any drugs, but yet he cannot explain in any

13   way the nature of this violent assault which began at the

14   residence, continued to the mother's residence, and out into

15   the street.  There is no other explanation, at least in my

16   mind, certainly circumstantial evidence the defendant has

17   returned to the use of drugs.

18         The actions of the defendant coupled with his failure

19   or attempt to defeat the drug screens clearly give this

20   Court the belief that he has returned to the lifestyle that

21   brought him to prison.

22         The need for the sentence imposed is to protect the

23   public, protect the victim.  According to her statements, at

24   least the audio statements, she was attempting to leave the

25   defendant's residence.  There is no evidence that I've seen

1   in any reports that she was in any way, shape, or form the

2   fiance of the defendant.  To the contrary, the statement she

3   gave was that she was attempting to leave.  She wanted to

4   travel outside of the state, as I understood her statement

5   to law enforcement.

6        So I find no credible -- certainly not credible that

7   this is a couple that has been together or continues to be

8   together or continues to be married.  That's all beside the

9   point.

10       But I have an obligation to protect the public, make

11  certain this defendant does not continue to engage in the

12  drug trade.  If he's using drugs, he is certainly

13  trafficking in drugs or purchasing drugs or dealing with

14  individuals who may be in the drug trade.

15       The $83,000, that's a large sum of cash.  The Court

16  has no way of knowing or ascertaining whether those are

17  proceeds of earlier drug trafficking.  That seems to be the

18  position taken.  I have no way of knowing.  But if in fact

19  it is evidence from the earlier drug transaction, it is only

20  evidence of how extensive this defendant's drug trafficking

21  was.

22       The defendant, as I've already noted, has received a

23  substantial deduction from any earlier sentence and he does

24  not deserve a second chance.  I made it clear at the time of

25  these reductions, I think, there was no misunderstanding,

1    supervised release and following the Court's direction and

2    not engaging in any further misconduct would clearly be a

3    condition of supervised release.

4         That has not been the case.  And for those reasons,

5    the Court will do the following:

6         Pursuant to the Sentencing Reform Act 1984, based upon

7    the defendant's revocation, the Court will impose a term of

8    37 months in the Bureau of Prisons.  That will bring the

9    defendant to the 78 months, I believe, or thereabouts which

10   was the Court's original sentence.

11        Candidly, I contemplated going much higher.  There is

12   no reason for this kind of assault.  None whatsoever.  And

13   it will not be tolerated by individuals on supervised

14   release generally, and specifically in this case.

15        The defendant's term of supervised release will

16   recommerce upon completion of the 37 months with the balance

17   of the five years I put in place in this matter subject to

18   all the terms and conditions I've originally put in place.

19        And I think I've adequately addressed all the reasons

20   under 18:3553(a) why this sentence is necessary and why it

21   clearly is called for.

22        And I'll note for the record, I'll make part of the

23   record all the police reports, incorporate them all by

24   reference.  I referred to them all.  I've read them all.

25   They clearly support what a vicious beating this victim

1    suffered, despite what statements she made here today.

2         I don't believe in any way, shape or form -- I find it

3    totally incredible that her beating was the result of any

4    altercation with the defendant where she struck him,

5    etcetera.  I don't believe that for a second.  Even if she

6    did, she certainly did not in any way deserve the kind of

7    beating she suffered in any way, shape or form.

8         That will be the Court's order.

9         Before we adjourn, Mr. Chiolo, you have a right to

10   have an appeal filed, if you wish, from the Court's

11   sentence.  You have retained counsel, so they can perfect

12   that appeal if would you'd like.

13        Do you understand that?

14             THE DEFENDANT:  Yes.

15             THE COURT:  That's the Court's order.

16   We will standard adjourned.

17   (Proceedings concluded at 12:15 p.m.)

18

19                 C E R T I F I C A T E

20        I certify that the forgoing is a correct transcript

21   from the record of proceedings in the above-entitled matter.

22

23        S/Caroline Mahnke                 10-26-09

24        Caroline Mahnke, RMR, CRR            Date

25